**425 BEECHER, L.L.C., Appellant,**

v.

**UNIZAN BANK, NATIONAL ASSOCIATION et al., Appellees.**

[Cite as *425 Beecher, L.L.C. v. Unizan Bank, Natl. Assn.*, 186 Ohio App.3d 214, 2010-Ohio-412.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 08AP–1045.

Decided Feb. 9, 2010.

Plank & Brahm, L.P.A., and David Watkins, for appellant.

Bricker & Eckler, L.L.P., and Quintin F. Lindsmith, for appellees.

BROWN, Judge.

{¶ 1} This is an appeal by plaintiff-appellant, 425 Beecher, L.C.C. ("425 Beecher"), from a decision and entry of the Franklin County Court of Common Pleas, denying 425 Beecher's motion for partial summary judgment and granting the cross-motion for summary judgment of defendants-appellees, Unizan Bank, National Association ("Unizan Bank"), and Unizan Financial Corporation ("Uni-

zan Financial"), (collectively "appellees"). 425 Beecher also appeals from the trial court's decision and entry denying its motion for reconsideration and cross-motion for summary judgment and granting appellees' motion for summary judgment as to the remaining counts of the complaint.

{¶ 2} The following factual background is taken primarily from the trial court's decision and entry filed October 10, 2007. 425 Beecher and 3780 Ridge Mill, L.L.C. ("3780 Ridge Mill"), are limited-liability corporations formed by Sayed Vakilian for the purpose of owning real estate investment properties.

{¶ 3} On June 10, 2003, Unizan Bank issued a commitment letter to 425 Beecher, agreeing to loan 425 Beecher the sum of $840,000 to refinance a real estate investment. The loan had a ten-year maturity period, and the commitment letter allowed 425 Beecher to choose between two interest-rate options. Under the first option, 425 Beecher could select an interest rate that was fixed for the first five years, adjustable annually thereafter, with a prepayment penalty of one percent on any principal repaid during the first six years.

{¶ 4} Under the second option, the borrower could select a "ten (10) year fixed interest rate through the FixPlus Program plus a margin of two and one quarter percent (2.25%)." Unizan Bank's "Ten Year FixPlus Program" ("FixPlus loan") provided for "prepayment consideration," rather than a penalty, if the outstanding principal amount of the note was prepaid before maturity. Specifically, in the event the borrower prepaid the loan (in part or in whole) prior to maturity, the borrower "may either pay or receive a prepayment consideration, which consideration would be depend[e]nt upon interest rates at the time of prepayment," with such amount to be "determined according to the Promissory Note."

{¶ 5} The trial court cited the purpose of prepayment consideration as affording protection to both the lender and the borrower, and to lessening the risks associated with rising or falling interest rates by sharing the corresponding benefits. More specifically, the trial court observed:

> Without prepayment consideration, after the loan is made the borrower benefits from rising interest rates because the borrower repays the loan at below-market rates. At the same time, the lender earns less on the borrower's lower-rate loan than it could if those funds were available to loan at current higher-market rates. Likewise, when interest rates fall after the loan is made, the lender benefits because it receives a higher rate of return from the borrower than it could if it had to loan those funds at current market rates.

> Prepayment consideration allows the lender to also benefit from rising interest rates because the lender can use the prepaid principal to fund a new loan at a higher rate. When a lender pays consideration to a borrower for prepaying the principal on a lower-rate note, the lender in effect shares with the borrower the additional profits it earns from the higher-rate loan the

lender made with the funds the borrower prepaid. Falling interest rates permit the borrower to refinance at a lower rate, so the borrower gives the lender consideration for prepaid principal on a higher-rate note, at least partly compensating the lender for the lower rate it will receive when it loans the funds the borrower prepaid.

{¶ 6} 425 Beecher selected the FixPlus loan and, on July 14, 2003, Unizan Bank and 425 Beecher executed a promissory note for a ten-year term. The promissory note was prepared by Unizan Bank and contained a provision for calculating a prepayment consideration amount "[u]pon prepayment of all or any portion of the principal amount of the Note," whereby either the lender or the borrower "may be entitled to receive payment of a prepayment consideration." Vakilian also signed a commercial mortgage guaranty for the loan.

{¶ 7} In June 2005, Vakilian entered into contracts for the sale of four real estate properties held by several of his limited-liability companies, one of which included the 425 Beecher property secured by the 2003 promissory note. On July 22, 2005, Vakilian sent a letter to Unizan Bank, requesting that the bank calculate the prepayment-consideration amount as of August 1, 2005. Vakilian claimed that Unizan Bank subsequently refused to honor the terms regarding the prepayment consideration based upon Vakilian's contention that 425 Beecher was entitled, under the terms of the formula set forth in the promissory note, to prepayment consideration in the amount of $213,524.63 as of the date of prepayment (August 1, 2005).

{¶ 8} On October 21, 2005, 425 Beecher, 3780 Ridge Mill, and Vakilian filed a complaint against appellees, seeking declaratory relief and alleging causes of action for breach of contract, fraud, intentional interference with business relations, and negligence. On May 22, 2006, appellees filed an answer and counterclaim, asserting causes of action for breach of contract, unjust enrichment, and declaratory judgment. On July 28, 2006, 425 Beecher and the other plaintiffs filed a motion for partial summary judgment as to Counts 1 (breach of contract), 3 (declaratory judgment), 4 (breach of contract), and 6 (declaratory judgment) of the complaint. On August 28, 2006, appellees filed a memorandum in opposition to the motion for partial summary judgment.

{¶ 9} On October 15, 2006, appellees filed a cross-motion for summary judgment as to Count 1 of their counterclaim, asserting that Unizan Bank made a drafting error in the prepayment consideration clause of the promissory note issued to 425 Beecher. Specifically, appellees argued that, instead of using the London Interbank Offered Rate ("LIBOR") as a reference for a margin (or spread), the individual who drafted the note mistakenly used language that included the one-month LIBOR rate itself in the formula. According to appellees, by removing the erroneous one-month LIBOR rate from the calculation,

Unizan Bank owed 425 Beecher prepayment consideration in the amount of $14,384 (rather than $213,524.63 as claimed by 425 Beecher) as of the August 1, 2005 prepayment date. Appellees sought reformation of the promissory note based upon unilateral mistake. 425 Beecher filed a memorandum against appellees' cross-motion for summary judgment.

{¶ 10} By decision and entry filed October 10, 2007, the trial court denied 425 Beecher's motion for partial summary judgment on Counts 1 (breach of contract) and 3 (declaratory judgment) and granted appellees' cross-motion for summary judgment, finding that appellees made a unilateral mistake in drafting the prepayment-consideration language. The trial court further determined that reformation of the promissory note was the appropriate remedy. On December 6, 2007, 425 Beecher filed a motion for reconsideration. On December 27, 2007, appellees filed a motion for summary judgment as to the remaining counts of the complaint. On January 17, 2007, 425 Beecher filed a cross-motion for summary judgment.

{¶ 11} On November 4, 2008, the trial court filed a decision and entry denying 425 Beecher's motion for reconsideration, and granting appellees' motion for summary judgment on the remaining counts of the complaint. The trial court also denied 425 Beecher's cross-motion for summary judgment.

{¶ 12} On appeal, 425 Beecher sets forth the following two assignments of error for this court's review:

[I.] The trial court erred in granting summary judgment in favor of Unizan and denying summary judgment as to 425 Beecher by holding that Unizan made a unilateral mistake that justified reforming the contract between Unizan and 425 Beecher.

[II.] The trial court erred in granting summary judgment to Unizan by holding that Unizan was not negligent.

{¶ 13} Under the first assignment of error, 425 Beecher argues that the trial court erred in granting summary judgment in favor of appellees by holding that Unizan Bank made a unilateral mistake justifying reformation of the contract. 425 Beecher challenges the deposition testimony submitted as summary-judgment evidence, as well as the trial court's application of the law.

{¶ 14} An appellate court's review of summary judgment is de novo. *Bonacorsi v. Wheeling & Lake Erie Ry. Co.*, 95 Ohio St.3d 314, 2002-Ohio-2220, 767 N.E.2d 707, ¶ 24, citing *Doe v. Shaffer* (2000), 90 Ohio St.3d 388, 390, 738 N.E.2d 1243. In accordance with Civ.R. 56(C), "summary judgment shall be granted when the filings in the action, including depositions and affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Bonacorsi* at ¶ 24.

{¶ 15} As noted under the facts, the trial court reformed the contract between 425 Beecher and appellees on the basis that Unizan Bank made a unilateral mistake in drafting the prepayment-consideration clause of the promissory note. That clause states as follows:

PREPAYMENT CONSIDERATION. Upon prepayment of all or any portion of the principal amount of the Note, either the Lender or Borrower may be entitled to receive payment of a prepayment consideration (the "Prepayment Consideration"). The Borrower hereby agrees to pay to the Lender, and the Lender agrees to pay the Borrower, the Prepayment Consideration identified below at the time and with respect to each partial prepayment or total prepayment of the outstanding principal amount evidenced by the Note.

The Prepayment Consideration shall be an amount equal to the aggregate of the consideration calculations with respect to each scheduled installment payment of principal of the Promissory Note being prepaid as follows:

The Prepayment Consideration with respect to the prepayment of each scheduled payment shall be an amount equal to the present value, applying the Discount Rate over the number of interest payment periods until the scheduled principal payment date, of:

a) The stated interest rate on the Note minus the sum of

i) The interest rate on current issue United States Treasury obligations with a maturity equal to the number of years (or fraction thereof) between the prepayment date and the scheduled principal payment date. Such rate, where necessary, will be determined by interpolating between current issue United States Treasury obligations.

ii) A spread of 2.25% over the one month London Interbank Offered Rate ("LIBOR") which is the rate per annum at which United States Dollar deposits are offered by prime banks in the London Interbank Market to leading banks in the London Interbank Market at 11:00 AM London, England time.

multiplied by

b) the amount of the scheduled principal payment, or portion thereof being prepaid, divided by 12.

\* \* \*

If the Prepayment Consideration so calculated is a positive amount, then Borrower shall pay such amount to Lender. If the Prepayment Consideration is a negative amount, then the Lender shall pay such amount to Borrower.

{¶ 16} At issue, in particular, is the language contained in (a)(ii) of the clause, i.e., "[a] spread of 2.25% over the one month London Interbank Offered Rate." Appellees argued before the trial court that Unizan Bank made a mistake in drafting the above language when the drafter misread and misunderstood the

instructions it received from another financial institution (Key Bank); specifically, instead of using LIBOR as a reference for the 2.25 percent margin, it also included the one-month LIBOR rate itself, thus adding a third rate to be subtracted from the stated interest rate, resulting in an immediate negative amount (i.e., an immediate amount payable to the borrower) as of the closing date.[1]

{¶ 17} As noted under the facts, 425 Beecher alleged it was owed, under the terms of the formula set forth above, a prepayment-consideration amount of $213,524.63 as of the date of prepayment (August 1, 2005). In arriving at this calculation, Vakilian's accountant included the one-month LIBOR to arrive at a prepayment consideration rate of -3.753 percent (i.e., the accountant took the loan rate of 6.28 percent and subtracted from that rate the sum of: (1) the United States Treasury obligation (4.259 percent as of August 1, 2005); (2) the spread/margin of 2.25 percent; and (3) the one-month LIBOR (3.53 percent) as of August 1, 2005).[2] Because the sum of the equation was negative, 425 Beecher insisted that Unizan Bank owed it $213,524.63 under the terms of the promissory note.

{¶ 18} In asserting that a mistake was made by including the one-month LIBOR rate in the prepayment consideration, Unizan Bank argued before the trial court that no trier of fact could reasonably conclude that a bank would intentionally make a ten-year loan for $840,000 and agree to accept $626,475.37 as full payment. The trial court agreed, and found unpersuasive 425 Beecher's insistence that item (a)(ii) accurately reflected a meeting of the minds when, under 425 Beecher's interpretation, a change in interest rates of less than one percent over two years resulted in a 25 percent discount of the principal amount of the loan.

{¶ 19} The trial court further rejected 425 Beecher's theory that Unizan Bank agreed to loan 425 Beecher the amount of $840,000 under terms whereby *"Unizan owed prepayment consideration to 425 Beecher the moment it signed the contract,"* holding that "[t]o interpret item (a)(ii) to mean that 425 Beecher had a contract right to prepayment consideration had it prepaid the loan the same day is commercially unreasonable and flatly untenable." (Emphasis sic.)

---

**1.** Appellees argue that the prepayment consideration was intended to be calculated by subtracting from the fixed rate (i.e., the stated interest rate of 6.28 percent) the interest rate on United States Treasury obligations and further subtracting 2.25 percent, representing the margin over (but not including) LIBOR.

**2.** According to Vakilian's accountant, the prepayment-consideration rate, when multiplied by the amount of scheduled principal payments divided by 12, resulted in total consideration in the amount of $221,989.24. The present value, based upon the discount rate, was then determined to be $213,524.63.

The court found that the prepayment-consideration formula, as drafted, did not bear a reasonable relation to the risks associated with charging interest rates, i.e., no bank would intentionally agree to lend money under terms whereby it would owe money if the loan was prepaid the same day it was signed, and no borrower could reasonably expect to take out a loan and then receive payment for paying off the principal amount the same day.

{¶ 20} 425 Beecher first argues that appellees did not produce any evidentiary materials of the type listed in Civ.R. 56(C) to support the trial court's finding of unilateral mistake in granting appellees' cross-motion for summary judgment. 425 Beecher maintains appellees failed not only to prove the existence of a mistake, but also failed to prove that 425 Beecher knew of the mistake and took advantage of it.

{¶ 21} In *L.B. Trucking Co., Inc. v. C.J. Mahan Constr. Co.*, 10th Dist. No. 01AP–1240, 2002-Ohio-4394, 2002 WL 1969645, ¶ 46, this court discussed the doctrine of unilateral mistake, holding:

"A unilateral mistake occurs when only one party has an erroneous belief as to the facts. (In a sense, of course, even in a case of unilateral mistake, both parties are mistaken: one is mistaken as to some fact and the other is mistaken in thinking that the first party is not mistaken)." 2 Farnsworth on Contracts (2 Ed.1998) 585–586, Section 9.4.

{¶ 22} In cases of unilateral mistake, "one party recognizes the true effect of an agreement while the other does not." *Gen. Tire, Inc. v. Mehlfeldt* (1997), 118 Ohio App.3d 109, 115, 691 N.E.2d 1132.

{¶ 23} In evaluating the record on summary judgment, we disagree with 425 Beecher's contention that the deposition testimony of Christopher Welch, Edward Cohn, and Jenny Marks contains no evidence of the type required by Civ.R. 56(C) to show a mistake by Unizan Bank. Edward Cohn, former president of the Columbus region of Unizan Bank, gave testimony regarding the preparation of the promissory note. Cohn testified that the language in the prepayment-consideration provision was not common; rather, it was specific to a program Unizan Bank offered for "a limited or fairly short period of time that was in conjunction with McDonald Investments/Key Bank" ("Key Bank"). According to Cohn, "the prepayment language that was to be inserted in the note was provided in a boilerplate form" by Key Bank to Unizan Bank, and Unizan Bank "was to put that language into the loans that it made under this program."

{¶ 24} Cohn testified that after Vakilian requested a payoff of his note, it was discovered that "there was an error in the language in the note and it is different than what Key Bank had instructed Unizan to put in * * * under prepayment penalty." Specifically, the error occurred under clause (a)(ii) of the Prepayment

Consideration provision, which referred to " '[a] spread of 2.25 percent over the one-month London Interbank Offered Rate.' " The boilerplate that Mc-Donald/Key Bank provided was to insert " 'margin over LIBOR.' " Cohn testified that "[t]he error that Unizan made was to interpret 'margin over LIBOR' to include LIBOR, so 2.25 percent plus LIBOR is what was put in, instead of just the 2.25 percent." The bank also made the same mistake in its commitment letter. Cohn testified that "Key Bank * * * conveyed * * * to Unizan, that the bank made a mistake." According to Cohn, "[t]he error in the language was not discovered until Mr. Vakilian called for his payoff."

{¶ 25} Christopher Welch was employed as an attorney by Unizan Bank during the events at issue, and he was a signatory, along with Walter Kropp, on the June 10, 2003 commitment letter from Unizan Bank to 425 Beecher. Part of his duties included drafting promissory notes, and the documents were produced using a software program, "LaserPro." If a loan was approved, an order would be placed to someone in the legal department, who would "then be responsible for keying in certain data into the LaserPro software setup so that it would generate documents that would be consistent with the bank's loan policies and procedures."

{¶ 26} Welch testified that Jenny Marks, general counsel for Unizan Bank, inserted certain language in the promissory note that should not have been included. According to Welch:

> [I]n looking at the documentation of suggested language that was provided to us by the McDonald Company, * * * it originally read, "A spread of blank percent." It had in parentheses "spread over LIBOR." And I believe that she misinterpreted that language to mean that there needed to be additional language that said such-and-such about the spread over LIBOR, instead of inserting an actual number, be it whole or a fraction to represent what that spread over LIBOR is.

{¶ 27} Welch further explained that "subparagraph (a)(ii) * * * should have ended at the percent sign and the remainder of the verbiage should have been excluded." Thus, according to Welch, the language "appearing after the percent sign in the remainder of (a)(ii) of the note" was not intended to be included as part of the prepayment consideration paragraph (a)(ii). Welch testified that no one at the bank knew of the mistake in the loan documents until Vakilian asked for payment.

{¶ 28} In its motion for reconsideration, 425 Beecher attached a letter from Welch to counsel for 425 Beecher, dated June 27, 2005, stating:

> Due to an administrative error at the time of closing, the prepayment language set forth in the Promissory Note contains incorrect language. Specifically, a significant portion of (a)(ii) following "A spread of 2.25% * * *" was unintentionally included. The effect of this error is that it gives the Borrower

a significant financial windfall, which was neither bargained for nor the intent of the parties. In fact, as written Unizan Bank would have been required to pay its Borrower a "Prepayment Consideration" had the Borrower prepaid the Loan immediately after closing (even with no change in the applicable interest rate). The amount of such windfall, had the Borrower prepaid the Loan immediately after the closing, would have totaled $45,264.00.

{¶ 29} Jenny Marks, a former senior vice-president and general counsel for Unizan Bank, testified that she was the individual who drafted the language at issue using the bank's LaserPro document software. Regarding the prepayment-consideration language, Key Bank provided samples of suggested language, and Marks attempted to copy and put that language into the LaserPro format. The specific language appearing in the promissory note (i.e., "[a] spread of 2.25% over the one month London Interbank Offered Rate") was not provided by Key Bank. Rather, Marks testified, she "was trying to copy as closely as possible the sample that he had sent to us for this program. To the extent that I copied it improperly or it doesn't work as it was supposed to, it's a mistake." Marks further stated that she made a mistake in that the standard loan she prepared for the FixPlus program does not mirror the net result it was supposed to under the program as presented by McDonald. She explained that she did not copy "this additional language * * * correctly from the Key sample what should have been in this document." Marks left her employment with Unizan Bank in early 2007, and she was unaware of any mistake regarding the promissory note until after her employment ended.

{¶ 30} In considering the issue of unilateral mistake, and whether Unizan Bank was negligent in its conduct, the trial court, in granting appellees' motion for summary judgment, found that appellees provided evidence of the type admissible at trial to support its claim that it made a mistake drafting item (a)(ii) of the prepayment-consideration formula; the court further found that while Unizan Bank made a mistake, it acted in good faith in drafting item (a)(ii).

{¶ 31} In its decision denying 425 Beecher's motion for reconsideration, the trial court again addressed and rejected the claim that appellees failed to provide Civ.R. 56(C) evidence of a mistake. Specifically, the trial court held that 425 Beecher "must not merely disbelieve but must completely ignore the testimony of Unizan's president (Cohn), its in-house counsel who discovered the mistake (Welch), and its former in-house counsel who made the mistake (Marks), each of whom testified at length." The trial court noted that "Cohn explained precisely what the mistake was and how it was made," that Marks "expressly testified that she made a mistake," and that Welch testified he was unaware of the mistake until Vakilian asked him to calculate the amount owed if the loan was prepaid on August 1, 2005. The trial court also held that except for disagreeing with the

above witnesses, 425 Beecher failed to present any testimony that Unizan Bank did not make a mistake in drafting the promissory note.[3] Upon review, we agree with the trial court that the deposition testimony cited above presented evidentiary materials of the type required under Civ.R. 56(C).

{¶ 32} 425 Beecher further contends that the trial court erred in finding that Vakilian had knowledge of the mistake, and in ruling in favor of appellees based upon an analysis of the law as stated in Restatement of the Law 2d, Contracts (1981), Sections 153 and 154. In support of his contention that appellees did not make a mistake, Vakilian cites his own affidavit, in which he averred that Walter Kropp told him that the prepayment-consideration formula was favorable to him on the date of closing.

{¶ 33} The trial court deemed it reasonable to allocate the risk of mistake to 425 Beecher under Restatement at Section 154(c). The court cited Vakilian's own deposition testimony in finding that he knew the parties had entered into an agreement under terms in which Unizan Bank owed prepayment consideration to the borrower the moment the contract was signed.

{¶ 34} Restatement of the Law 2d, Contracts (1981), Section 153, states as follows:

Where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if he does not bear the risk of the mistake under the rule stated in § 154, and

(a) the effect of the mistake is such that enforcement of the contract would be unconscionable, or

(b) the other party had reason to know of the mistake or his fault caused the mistake.

{¶ 35} Restatement of the Law 2d, Contracts (1981), Section 154, states:

A party bears the risk of a mistake when

(a) the risk is allocated to him by agreement of the parties, or

(b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or

---

**3.** The trial court addressed and found unpersuasive Vakilian's postdeposition affidavit in which Vakilian stated that he did not believe Unizan Bank made a mistake. The trial court found that Vakilian's affidavit "does little more than repackage the allegations in his complaint," and the court held that 425 Beecher "cannot rebut Unizan's factual statements that it *did* make a mistake with Vakilian's personal opinion that he believes Unizan *did not* make a mistake."

(c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so.

{¶ 36} Here, the trial court found that Vakilian "knew or should have known" that the bank's prepayment consideration formula was a mistake. The trial court cited evidence that Vakilian knew, at the time of the closing, that Unizan Bank would owe prepayment consideration the moment the contract was signed. Specifically, the trial court pointed to Vakilian's deposition testimony, in which he stated he was aware that the formula, as written, would entitle him to prepayment consideration "if he merely prepaid the loan the same day it was granted." The trial court further held: "Vakilian knew the loan would be upside-down the moment it was made, which anyone, especially someone with Vakilian's expertise, should recognize as a mistake." Finally, the court noted that Vakilian was a knowledgeable and experienced commercial real estate investor, "with more than $22 million in completed transactions," who acknowledged that he was aware that the prepayment formula was designed to rise or fall in tandem with market interest rates.

{¶ 37} Upon review, the record supports the trial court's findings. During his deposition, Vakilian testified that just prior to the closing, he obtained the current United States Treasury Rate (3.98 percent) (item (a)(i)) as well as the current one-month LIBOR (1.10 percent) (item (a)(ii)). Vakilian then took the fixed-loan interest rate (6.28 percent) and subtracted the sum of (a) the 3.98 percent United States Treasury Rate, (b) the 2.25 percent spread, and (c) the 1.10 percent LIBOR rate (which totaled 7.33 percent), resulting in negative 1.05 percent. Based upon his calculations, Vakilian testified that he knew, at the time of the closing, that if he paid off the loan the following day he "would get money back."

{¶ 38} Vakilian stated that he did not calculate the exact amount he would be entitled to at that time because he "had no interest in paying the loan off the next day." Rather, it was his sense that "the longer I [held] onto the note, the higher the rate would go because the rates had gone down for some time." While he did not calculate what the amount would have been at the closing, Vakilian acknowledged: "I know that the bank would have owed me money if I would have paid it off the next day."

{¶ 39} When asked whether he informed Unizan Bank vice-president Walter Kropp that the bank was already "upside down one percent" at the time the loan agreement was executed, Vakilian responded: "Walter is an experienced banker. He knows what the rates are." Vakilian stated that Kropp "knew exactly how things were. I am not there to offend Walter Kropp and to try to give him a lesson about how his note and how his loan documents should work when he has been a banker for * * * probably 20 year[s] plus."

{¶ 40} Walter Kropp, former vice-president with Unizan Bank, who negotiated the loans with Vakilian on behalf of the bank, also gave deposition testimony. Prior to Vakilian's request for prepayment consideration in 2005, Kropp stated that he had no discussions with anyone at the bank regarding a mistake with the note. Kropp was unaware of any problem with the promissory note until several months after he had left employment with Unizan Bank; specifically, in September 2005, he learned from Unizan Bank employees Ed Cohn and Kim Taylor that there was a problem with the promissory note.

{¶ 41} In the present case, appellees presented evidence of an error by Unizan Bank in drafting the prepayment-consideration language of item (a)(ii) of the clause, as well as evidence that the error went unnoticed by the bank until after Vakilian requested a calculation of the prepayment-consideration amount. Appellees argue, and we agree, that the parties understood that in the event of prepayment, the determination whether the lender or borrower would be entitled to prepayment consideration was dependent upon a *change* in interest rates. The trial court, in finding a unilateral mistake, recognized that the purpose of the prepayment clause was to allocate the risk regarding future changes in interest rates; further, that the nature of the mistake was evinced by the fact that at the time of closing, before interest rates had even changed, the formula for prepayment-consideration, as drafted, resulted in immediate prepayment-consideration to the borrower had the borrower prepaid that day. Upon review, the record supports the trial court's determination that the prepayment-consideration clause was a basic assumption upon which the agreement was based, that Unizan Bank made a mistake in drafting the clause, and that the mistake had an adverse material effect on the agreed exchange of performances.

{¶ 42} Furthermore, the deposition testimony of Vakilian indicates that he had knowledge that the bank would have owed money to the borrower on the date of the closing; as noted above, Vakilian testified that he performed, prior to closing, a calculation that included LIBOR rate in the formula, and that he was aware the bank would have owed prepayment consideration on the closing date. An individual " 'has reason to know a fact * * * if he has information from which a person of ordinary intelligence would infer that the fact in question does or will exist.' " *Hikmet v. Turkoglu,* 10th Dist. No. 08AP–1021, 2009-Ohio-6477, 2009 WL 4699101, ¶ 68, quoting Restatement of the Law 2d, Contracts (1981), Section 19, Comment *b.* Here, Vakilian had reason to know of the mistake at the time of the closing, and the evidence submitted on summary judgment supports the trial court's determination that Vakilian recognized the "true effect" of the agreement at the time the promissory note was executed, while appellees did not.

{¶ 43} Following the trial court's grant of summary judgment in favor of appellees, 425 Beecher submitted the affidavit of Vakilian, in which he averred:

"Walter Kropp told me that the note was market driven" and "the Prepayment Consideration formula was favorable to 425 Beecher on the date of closing." The statement in the affidavit, however, does not present evidence inconsistent with Kropp's deposition testimony that he was unaware of a mistake with the promissory note until after Vakilian requested a calculation of the prepayment consideration. Given that the formula for prepayment consideration included a nonfixed rate (i.e., "the interest rate on current issue United States Treasury obligations"), the parties were aware, prior to the closing date, that the calculation for prepayment consideration was "market driven" in that a change in interest rates might benefit one party or the other. Vakilian stated during his deposition that he was aware that the manner in which "the markets were going to act was going to determine who owed money to who." As already noted, Vakilian further stated during his deposition that he did not inform Kropp of his (Vakilian's) calculation showing a negative prepayment-consideration amount at the time of closing.[4] Upon review, we agree with the trial court's determination that Vakilian's postdeposition affidavit, submitted with 425 Beecher's motion for reconsideration, did not create an issue of fact that appellees were aware of a mistake at the time of the closing.

{¶ 44} In general, courts do not reform contracts when a party makes a unilateral mistake. *L.B. Trucking*, 2002-Ohio-4394, 2002 WL 1969645, at ¶ 47. However, if the mistake occurred " 'due to a drafting error by one party and the other party knew of the error and took advantage of it, the trial court may reform the contract. * * * Reformation is appropriate if one party believes that a contract correctly integrates the agreement and the other party is aware that it does not, even though the mistake was not mutual.' " Id., quoting *Galehouse Constr. Co., Inc. v. Winkler* (1998), 128 Ohio App.3d 300, 303, 714 N.E.2d 954.

{¶ 45} In the present case, the trial court found that rescission was not an appropriate remedy because the parties had fully performed their duties "except for determining the amount of prepayment consideration." Rather, the court deemed reformation to be warranted "where, as here, one party believes a contract correctly integrates the agreement and the other party is aware that it does not."

{¶ 46} Based upon this court's de novo review of the record, we find that the trial court did not err in finding a unilateral mistake, nor did the court err in finding reformation to be the appropriate remedy. Accordingly, the first assignment of error is without merit and is overruled.

---

4. The June 10, 2003 commitment letter similarly made clear that the borrower "may either pay or receive a prepayment consideration * * * depend[e]nt upon interest rates at the time of prepayment."

{¶ 47} Under the second assignment of error, 425 Beecher contends that the trial court erred in granting summary judgment in favor of appellees by holding that Unizan Bank was not negligent. 425 Beecher argued before the trial court that it suffered monetary losses because it would receive less prepayment consideration than it was led to believe.

{¶ 48} On appeal, 425 Beecher contends that it provided the trial court with evidence of negligent misrepresentation by appellees. Specifically, 425 Beecher argues that Unizan Bank represented that it intended to abide by the terms of the express agreement; 425 Beecher further argues that appellees failed to exercise reasonable care and competence in preparing and communicating the prepayment-consideration terms contained in the commitment letter.

{¶ 49} In granting summary judgment in favor of appellees on 425 Beecher's negligence claim, the trial court noted that the economic-loss rule generally prevents recovery in tort of damages for purely economic losses. See *Corporex Dev. & Constr. Mgt., Inc. v. Shook, Inc.*, 106 Ohio St.3d 412, 2005-Ohio-5409, 835 N.E.2d 701, ¶ 6, quoting *Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.* (1989), 42 Ohio St.3d 40, 42, 537 N.E.2d 624 ("This rule stems from the recognition of a balance between tort law, designed to redress losses suffered by breach of a duty imposed by law to protect societal interests, and contract law, which holds that 'parties to a commercial transaction should remain free to govern their own affairs' ").

{¶ 50} Under Ohio law, "a breach of contract does not create a tort claim." *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.* (1996), 115 Ohio App.3d 137, 151, 684 N.E.2d 1261, quoting *Wolfe v. Continental Cas. Co.* (C.A.6, 1981), 647 F.2d 705, 710 ("Generally, 'the existence of a contract action * * * excludes the opportunity to present the same case as a tort claim' "). See also *Infocision Mgt. Corp. v. Found. for Moral Law, Inc.* (E.D.Ohio 2009), No. 5:08CV1343 (if a party could simply create a tortious action by alleging that a contracting party never intended to fulfill his promise there would be no effective way of preventing almost any contract case from being converted to a tort action).

{¶ 51} In cases where negligent-misrepresentation claims have been recognized, Ohio courts have required "the existence of a duty to provide accurate information to the plaintiff that goes beyond the common-law duty to exercise reasonable care to prevent foreseeable harm." *Universal Contracting Corp. v. Aug*, 1st Dist. No. C–030719, 2004-Ohio-7133, 2004 WL 3015325, ¶ 14. When the parties to a transaction are sophisticated business entities who have contracted to protect against economic loss, "contract principles override * * * tort principles * * * and economic damages are not recoverable except as provided in the contract or by the rules of contract interpretation." Id. at ¶ 20.

Further, a tort claim based upon the same actions as those upon which a breach-of-contract claim is based will exist independently of the contract action "only if the breaching party also breaches a duty owed separately from that created by the contract, that is, a duty owed even if no contract existed." *Textron Fin.*, 115 Ohio App.3d at 151, 684 N.E.2d 1261.

{¶ 52} In addition to its discussion of the economic-loss doctrine, the trial court in the present case found that 425 Beecher failed to identify any duty that appellees owed to it "apart from those that were created by their contracts." We agree. In Ohio, "the relationship of debtor and creditor, without more, is not a fiduciary relationship," and "a bank and its customers stand at arm's length in negotiating terms and conditions of a loan." *Blon v. Bank One Akron, N.A.* (1988), 35 Ohio St.3d 98, 101, 519 N.E.2d 363. See also *Provident Bank v. Adriatic, Inc.*, 12th Dist. No. CA2004–12–108, 2005-Ohio-5774, 2005 WL 2840741, ¶ 23, quoting *Floor Craft Floor Covering, Inc. v. Parma Community Gen. Hosp. Assn.* (1990), 54 Ohio St.3d 1, 7, 560 N.E.2d 206 ("Appellants cite to no authority for the proposition that a lender owes a borrower a duty of care in the context of negotiating a loan agreement. Moreover, '[t]ort law is not designed * * * to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement' ").

{¶ 53} Here, the relationship between Unizan Bank and 425 Beecher as lender and borrower arose out of the parties' contractual agreement. Vakilian acknowledged during his deposition testimony that the promissory note was negotiated freely between him and the bank, and the record supports the trial court's finding that Vakilian was a "sophisticated investor who was not at a disadvantage in bargaining strength" during his dealings with Unizan Bank. A case relied upon by 425 Beecher, *Pavlovich v. Natl. City Bank* (C.A.6, 2006), 435 F.3d 560, 569, is not helpful to its argument, because the court in that case held that despite privity arising out of a custody agreement between a bank and its customer, "Pavlovich [had] not identified any tort duty owed by the Bank independent of contractually created obligations."

{¶ 54} Upon review, 425 Beecher has failed to show that appellees owed a duty of care independent of its contractual obligations. See, e.g., *Nichols v. Chicago Title Ins. Co.* (1995), 107 Ohio App.3d 684, 697, 669 N.E.2d 323 (in action alleging that defendants negligently administered loan, plaintiffs gained no advantage in asserting that administration of the loan amounted to "negligence" or "willful misconduct" because the claims were based on the loan agreement and thus any duties defendants had arose out of a contract). Because 425 Beecher failed to identify a tort duty under Ohio law, the trial court properly granted summary judgment in favor of appellees as to the negligence claim, and 425 Beecher's second assignment of error is overruled.

{¶ 55} Based upon the foregoing, 425 Beecher's first and second assignments of error are overruled, and the judgments of the Franklin County Court of Common Pleas granting summary judgment in favor of appellees and denying 425 Beecher's motions for summary judgment and reconsideration are hereby affirmed.

Judgments affirmed.

FRENCH and McGRATH, JJ., concur.